## ROBERT J. LONG v. LACKAWANNA COAL & IRON COMPANY, ISAAC WRIGHT and ETTA O. DESHLER, Appellants.

### Division One, March 31, 1911.

1. **PLEADING: Admitting Title: Liberal Construction.** Where the petition alleges that plaintiff on a certain date was "the owner in fee simple" of the land, and defendants by answer admit plaintiff on said date "was the owner of the land described in the petition and on that day entered into a contract to sell the same" to one of defendants, it will not be held that plaintiff's "title in fee simple stands admitted," if, reading the answer from end to end, it cannot be construed that way. The doctrine of *contra proferentem* is not allowed in its common-law vigor and rigor. The rule under the code is that allegations of a pleading for the purpose of determining its effect, are to be liberally construed with a view to substantial justice between the parties.

2. ————: ————: **As Construed by Parties.** Where plaintiff at the trial did not construe the pleadings as admitting title in himself, but voluntarily assumed the burden of proving title in himself, he will on appeal be held to the same theory, namely, that the burden was on him.

3. ————: **Indefinite Denial: Theory at Trial.** An answer that "denies each and every allegation in said petition contained, except such as are hereinafter specifically admitted" is vague, indefinite and defective, since it places upon plaintiff and the court the burden of sifting out and determining what averments are denied and what admitted; but if plaintiff filed no motion to make definite and certain, nor moved for judgment

on the pleadings, but proceeded to trial on the theory that he understood the answer, he will be held to that theory on appeal, and it will not be held that there was no issue raised by the answer.

4. **PRIOR SUIT PENDING: Abatement: Cross-Suits.** The pendency of a prior suit brought by the defendant in this as plaintiff in that against the plaintiff in this as defendant in that, in which the present defendant sought to enjoin the present plaintiff from conveying the land to anyone except itself, in which a demurrer to the petition was sustained, does not work an abatement of this suit to have a recorded deed made by the contracting purchaser to this defendant removed as a cloud upon the title. The object and purpose of the two suits were not the same, the principles of law applicable are not the same, and the parties are not the same. The defense of a prior suit pending applies only when the plaintiff in both suits is the same, and both are commenced by himself, and not to cross-suits by a plaintiff in one who is a defendant in another.

5. **QUIETING TITLE: By Constructive Service: Void Statute.** A State statute may provide that the title to land within the State may be settled and determined by a suit in which a non-resident defendant is brought into court by publication.

6. **SALE OF LAND: Suit to Quiet Title: Three Years for Review of Judgment: Date Fixed by Contract.** Where the date in which the purchaser of land should perform was definitely fixed by written contract, and the vendor brought suit to quiet title by limitation and obtained judgment prior to that date, the purchaser cannot elongate and extend the time in which he is to perform to three years, on the theory that the suit, being brought by constructive notice, did not become absolute for three years after its date; and hence it is not necessary to determine whether or not under the statute, Sec. 2538, R. S. 1909, a judgment to quiet title by limitations became absolute immediately upon its rendition. Where "the time for the consummation of said contract" was "extended" to a designated date "to enable the seller to bring suit to quiet title" and in all other respects "the original contract was continued in force," and suit was brought and judgment obtained prior to that date, the duty of the purchaser was to perform on that date if the seller on that date had a good title, and he had no right to undertake to extend the contract to three years on the theory that such judgment would not sooner become absolute.

7. ————: ————: ————: ————: **Estoppel: Not Pleaded.** Where there is no opportunity to plead estoppel, it is available as evidence. Where the contract for the purchase of land was extended to a designated date "to enable the seller to bring a suit to quiet title to the land," and nothing is said about the

Long v. Lackawanna Coal & Iron Co.

purchaser's being entitled to three years longer in which to perform, at the end of which time the judgment would become absolute; and, in reliance upon the contract, the seller brings suit to perfect title under the eye of the purchaser's attorneys, and the suit ripens into a judgment, the purchaser is estopped to deny that performance would be consummated on the rendition of that judgment.

8. ————: Specific Performance: Good Title in Fee: Forfeiture: Earnest Money.   Uninterrupted, actual, visible, adverse possession of land for seventy-five years, under a color of title and claim of ownership, and the paying of taxes thereon during such period, not only bars all adverse claims, but creates and confers title under the ten-year, the twenty-four-year and the thirty-year Statute of Limitations; and the owner who contracts to convey "a good title in fee to said property" on a designated date is entitled, upon tender of deed, etc., on said date, to compel the purchaser to specifically perform, and, upon his refusal, to declare a forfeiture and retain the earnest money.

9. CONTRACTS: Enforcement: Earnest Money.   Courts sit to enforce fair contracts, fairly made and not against public policy; not to abrogate them.  And where the contract for the purchase of land provided that, upon the tender of a warranty deed conveying good title, the purchaser should complete the transaction, and upon such tender he refused to perform, but set up an untenable condition and persists therein, the vendor will be permitted to retain the earnest money paid him, though equity does not favor forfeiture.

Appeal from Jackson Circuit Court.—*Hon. Hermann Brumback,* Judge.

Affirmed.

*Johnson & Lucas* for appellants.

(1)  (a)  The evidence was insufficient to show that plaintiff had such a title as he had agreed to furnish, and insufficient to show that he had any title by the Statute of Limitations.  Weller v. Wagner, 181 Mo. 161; Crowl v. Crowl, 195 Mo. 347; Heckescher v. Cooper, 203 Mo. 293; McCune v. Goodwillie, 204 Mo. 306; Baker v. Thompson, 214 Mo. 514; Stone v. Perkins, 217 Mo. 586.   (b)  The admission that plaintiff

was the "owner" of the land, contained in the separate answer of the Lackawanna Coal & Iron Company, did not, when taken in connection with the other allegations of that answer, and the answers of the other defendants, make it unnecessary for plaintiff to prove title. 17 Am. and Eng. Ency. Law (1 Ed.), 299; Coombs v. People, 198 Ill. 586. (2) A conveyance of real estate, in consideration of one dollar and other valuable considerations, made by one who has purchased the same by written contract, is effective to pass to his grantee ·all his interest in the contract and the subject-matter thereof. R. S. 1899, sec. 900; Chew v. Keller, 171 Mo. 225; Strong v. Whybark, 204 Mo. 346; Weissenfels v. Cable, 208 Mo. 534. (3) A party who has entered into written contract to remedy the defects in his record title to real estate, and who in pursuance of it obtains a decree of court, cannot, because the decree does not become effective for three years from its date, change his position, and declare that his title is good by the Statute of Limitations; act upon the declaration, and maintain a suit to cancel the contract, on the ground that he has complied with it. Guffey v. O'Reiley, 88 Mo. 429; Rozier v. Graham, 146 Mo. 361; State ex rel. v. Branch, 151 Mo. 639; Cademartori v. Gauger, 160 Mo. 367; Layson v. Cooper, 174 Mo. 221; Tower v. Compton Co., 192 Mo. 393; St. Louis v. Wright Co., 202 Mo. 465. (4) A decree obtained on service by publication does not become effective to pass title or quiet title, until three years from its date; and if married women be defendants the effect of the decree may be longer postponed. R. S. 1899, sec. 779; Lindell Co. v. Lindell, 142 Mo. 85. (5) The effect of the decree was to forfeit the $2000 paid as earnest money—and to find that plaintiff had at the time of entering into the contracts a title such as he admitted by his last contract, as well as by his conduct, that he did not have. The assertion of a title by adverse possession is an admission that

the party relying on it has not the legal title. Probst v. Presbyterian, 129 U. S. 182. (b) Equity abhors forfeitures and will not enforce them directly or indirectly. Tetley v. McMurry, 201 Mo. 394. (6) Plaintiff was not entitled to maintain this suit, when a suit was already pending in the same court, which involved the same issues, and in which all issues raised by plaintiff could have been, and will be determined. Conbrough v. Adams, 70 Cal. 379; Wallace v. Robinson, 52 N. H. 286.

*Peak & Strother* for respondent.

(1) The petition alleged that at all times mentioned in it, plaintiff was the "owner in fee simple of" the land in question. The answer of defendant, the Lackawanna Coal & Iron Company, "admits that prior to May 24, 1906, plaintiff was the owner of the land described in the petition and that on that day he entered into a contract to sell the same to one E. O. Deshler, as set forth in said petition." On the record, therefore, plaintiff's title "in fee simple" stands admitted by said defendant. (2) The answer of Deshler, and of the Lackawanna Coal & Iron Company each "denies each and every allegation in said petition contained, except such as are hereinafter specifically admitted." This is no denial at all and raises no issue on the record. Dezell v. Fidelity Co., 176 Mo. 279; Atterbury v. Hopkins, 122 Mo. App. 172. (3) There was no evidence that John C. Long or his heirs ever had any title to, interest in, or possession of the land in question, or any part of it. (4) Even had there been any such evidence as to John C. Long, or his heirs, he did not die until 1840, and the evidence shows a continuous, adverse possession, beginning in 1835, and the statute having begun to run against John C. Long, has never ceased running. Franklin v. Cunningham, 187 Mo. 184. (5) As to one-half of the

land, plaintiff showed an unbroken record title from the United States. (6) As to the whole land, plaintiff showed a continuous, exclusive, open, notorious, adverse and hostile possession, claiming title under duly recorded warranty deeds purporting to convey the title, and payment of all taxes, for over seventy years. This was sufficient. Laws 1874, p. 119; R. S. 1899, secs. 653, 4268, 6269; Scannell v. Soda Fountain Co., 161 Mo. 606; DeHatre v. Edmonds, 200 Mo. 246. (7) The contract was not to furnish a "perfect record title," as contended by appellants. It was to furnish "a complete abstract of title . . . from the United States Government to date," and "a good title in fee to said property;" and the supplemental contract was "to bring suit to quiet the title . . . as required in the opinion of Johnson & Lucas, attorneys for the buyer." This requirement was that "a suit should be brought to quiet the title by the Statute of Limitations." Plaintiff fully complied with both contracts in every particular, and was entitled to retain the deposit money. Greffet v. Willman, 114 Mo. 118; Mitchener v. Holmes, 117 Mo. 185; Crews v. Garneau, 14 Mo. App. 505. (8) The statutes in regard to petitions for review (R. S. 1899, sec. 773-784), have no application to a suit under R. S. 1899, sec. 653, to perfect title by limitation. This latter statute is complete within itself, provides for a special case, specifies the manner of process and service thereof, and provides that "when such service shall be had, judgment and decree shall be rendered the same as though personal service had been had." Swan v. Railroad, 38 Mo. App. 588. (9) Said section 653 is a valid exercise of legislative power. Dillon v. Heller, 39 Kas. 599; Arndt v. Grigs, 134 U. S. 322. (10) The plaintiff at no time took inconsistent positions with reference to his title. He furnished a "complete abstract of title." He showed a "good title in fee." He brought a "suit to quiet title, by the Statute of Limi-

tations, as required by the opinion of Johnson & Lucas.'' On the trial of the suit at bar he showed a good title in fee by record to one-half of the land and by limitation as to the other half. In addition, the defendants themselves showed the proceedings in the suit to perfect title and admitted the regularity and legality of them. Moreover, there was no plea of estoppel. Keeney v. McVoy, 206 Mo. 56. (11) The pendency of the suit by the defendant, the Lackawanna Coal & Iron Company, against plaintiff, was no bar or cause of abatement of this suit. Rodney v. Gibbs, 184 Mo. 10. (12) Even had there been a failure on plaintiff's part to furnish such a title as was required by the contract, the counterclaim of defendant, the Lackawanna Coal & Iron Company, seeking to recover the $2000 deposit money, is inconsistent with its alleged suit for specific performance, and a waiver of such suit. Ryan v. Dunlap, 111 Mo. 610.

LAMM, J.—This is a suit in equity, brought on December 19, 1906, in the Jackson Circuit Court, to clear away a cloud on plaintiff's title to a part of the southwest quarter of section 36, township 50, range 33, in Jackson county—22 acres, more or less, described with particularity in the bill.

On May 24, 1906, plaintiff contracted in writing with defendant, Etta O. Deshler, she signing as "E. O. Deshler,'' thereby bargaining the land to her for $60,000—$2000 paid down. The contract, being unacknowledged, was not entitled to record. At a certain time thereafter she conveyed by deed to her corporate codefendant, the Iron Company, in which conveyance there was a narration referring to said contract, which deed was presently spread of record. The object of the suit is to cancel this deed and its record as a cloud upon the plaintiff's title.

From a decree canceling the deed, removing the cloud cast by its record and enjoining defendants sev-

erally and all persons claiming under them from setting up or relying upon any claim of title by virtue of said deed or contract, and finding against the right of the Iron Company to a return of said earnest money, and, on such finding, decreeing that plaintiff go hence without day, discharged of such claim, defendants, on due steps, come up by appeal.

*Of the pleadings*:

The bill alleges the Iron Company is a Missouri business corporation, located in Kansas City; that plaintiff at the times in hand was and is the owner of the real estate in question (describing it); that on May 24, 1906, plaintiff and defendant Deshler, under the name of "E. O. Deshler," entered into a written contract whereby plaintiff sold to her said real estate for the sum of $60,000—$2000 down; $18,000 to be paid upon the delivery of a warranty deed; and $40,000 to be paid on or before five years from such delivery, to be evidenced by Deshler's note, secured by a deed of trust on the land, bearing six per cent semi-annual interest, with the privilege of paying $5000 or any multiple thereof at any interest-paying period; that plaintiff, within ten days, was to furnish Deshler a complete abstract of title to said real estate, certified by a competent abstracter, from the United States Government to date, accompanied with the usual certificate; if upon examination it was found that plaintiff had a "good title in fee to said property," he was bound to execute "a general warranty deed," "free and clear of all liens," and concurrently therewith Deshler was bound to pay the balance of said cash payment and deliver said note and deed of trust securing the same; "if the title to said real estate should be found defective," plaintiff was to rectify the defects within a reasonable time, not to exceed sixty days "from the notice of such defect;" if such defects in the title "could not be cured or remedied" within that

period, then (if no extension of time was had) the contract became null and void and the advance payment of $2000 was to be returned to Deshler; if "the title should be good" and plaintiff had kept his part of said contract and Deshler should fail to comply with the requirements on "his" part within eighty days as agreed, then the $2000 was to be forfeited to plaintiff; and which contract also provided that time was made of the essence of the contract and that the sale and transfer should be consummated within ninety days of the contract date.

The bill further alleges that plaintiff and Deshler on the 30th day of June, 1906, entered into a further written contract whereby it was mutually agreed that the time for consummating the first contract was extended to the 20th day of September, 1906, and in all other respects the first contract was continued in force; that plaintiff complied with the terms and conditions of both contracts upon his part, tendered a general warranty deed to Deshler on the 20th of September, 1906, and demanded that Deshler perform and carry out the terms of the contract on her part by making the cash payment referred to and executing the note and deed of trust; that Deshler failed and refused to perform the terms and provisions of the contract on her part, refused to pay the balance of said cash payment and to execute either said note or deed of trust; that afterwards Deshler on the same day, to-wit, the 20th of September, 1906, unlawfully and wrongfully conspiring and confederating with her codefendants, executed to the defendant Iron Company a general warranty deed purporting to convey said real estate for a consideration of "one dollar and other valuable considerations," which deed, duly acknowledged on the same day, was filed for record by the said Iron Company and defendant Wright, and recorded at a given book and page in the office of the

233 Sup.—46

recorder of deeds for Jackson county, and which deed had, *inter alia,* the following recitation: "This deed is made in pursuance of a written contract dated May 24, 1906, by the terms of which the grantor herein purchased said real estate of said Robert J. Long;" that said recitation was false and was made for the purpose of connecting said deed with said written contracts and for the purpose of getting upon the record a statement in regard to said contract—the latter being unacknowledged and not entitled to record; that said deed was made with the purpose and intent of casting a cloud upon the plaintiff's title and preventing him from selling and conveying the land, and with the intent and purpose of compelling plaintiff to pay said defendants or some of them money in order to get the cloud removed; that at the time of executing the first contract defendant Wright delivered a cashier's check for $2000 to plaintiff as and for part of the cash payment, which check plaintiff cashed; that at the time of the execution of said contract defendant Wright induced plaintiff to believe that Deshler was a man ready, able and willing to buy said real estate at the contract price and had paid said $2000; but that after the execution of Deshler's deed to the Iron Company plaintiff learned she was a married woman, wholly insolvent, had no property or money and "in signing said contract acted as a figure-head, dummy or stool-pigeon" for her codefendant Wright; that in fact Wright paid said $2000 and Deshler paid no part thereof and in fact Wright was the purchaser of the land instead of Deshler; that Wright was and is insolvent and unable to carry out and perform the contract; that the Iron Company paid no money or property or any consideration of any kind to Deshler for her deed but took the same without consideration, with full notice and knowledge to it and its officers of the facts and circumstances aforesaid; that the deed from Deshler to the company and the record thereof

constitute a cloud and encumbrance upon plaintiff's title, preventing him from selling his land as he is lawfully entitled to do, depreciates the value thereof, were made and executed by defendants fraudulently and wrongfully, for the purpose of casting a cloud upon plaintiff's title and preventing him from selling his land or coercing him into the payment of money to defendant to get said cloud removed; that each of defendants has wholly failed and neglected and still fails and neglects to carry out and perform the contract on their part, by reason whereof plaintiff has declared the advance payment of $2000 forfeited in accordance with the contract terms and provisions; that plaintiff discovered the truth of the fraudulent practices aforesaid on the 19th day of October, 1906; that an action for damages would be an inadequate remedy for plaintiff's wrongs and injuries, suffered as aforesaid; and that he has no adequate remedy at law and therefore brings his suit in equity; that by reason of the premises he is entitled to have said deed canceled and said cloud removed and have his title established and quieted as against each and all defendants. Wherefore he prays, etc.

Defendant Deshler answers separately in a general denial, except as to those allegations specifically admitted, viz., first, that she purchased said real estate and that by a deed duly recorded she transferred her interest to her codefendant the Iron Company.

Defendant Wright answered by way of a general denial.

Defendant Iron Company by its separate answer denied all allegations, except those specifically admitted, viz.: It admits "that prior to May 24, 1906, plaintiff was the owner of the land described in the petition;" admits the contract to sell to Deshler as set forth, admits payment of the $2000, admits the extension agreement of June 30, 1906, and admits the execution of Deshler's deed to it. Further answering it

avers that the only conspiracy it has any knowledge of in the transactions referred to in the bill was the wrongful and fraudulent conspiracy of plaintiff, his agents and servants to attempt to convert to plaintiff's use the advance payment of $2000, "which was paid to him in good faith under the terms of said contract and for which sum with interest from September 20, 1906, this defendant asks judgment."

By way of "the whole truth of the matter" (which truth, it is alleged, is also set forth in the petition in another suit pending, filed September 27, 1906, entitled Lackawanna Coal & Iron Company, Plaintiff, v. Robert J. Long, Defendant), the answer goes on to say that the extension agreement referred to in plaintiff's petition in this cause was made for the purpose of enabling plaintiff to perfect the title to his land which had been found defective; that said Long undertook to cure the defects thereof, admitted by him to exist, by a proceeding in court; that said proceeding "had not become effective on September 20, 1906," and has "not now become effective," but that notwithstanding said Long failed to perfect the title and notwithstanding Deshler and this defendant, since it became the owner of Deshler's title, have been at all times ready and willing to take the title and carry out said contract as soon as the title became perfected, plaintiff had refused "to carry out the perfecting of said title" and has wrongfully and fraudulently attempted to convert said $2000 to his own use; that, as aforesaid, this defendant brought a suit against this plaintiff, setting up said contract, said payment and its willingness to perform as soon as the title was perfected. Here follow other allegations relating to defendant's said suit, the nature and object thereof, viz., to enjoin and restrain plaintiff from conveying said real estate to anyone except the Iron Company as soon as the title is perfect—which suit, the answer alleges, is a complete bar to this action.

Plaintiff's reply to the separate answer of the Iron Company denies the charges of fraud and conspiracy against defendant, admits the Iron Company brought the suit, described in its answer, on the 27th day of September, 1906, and denies all other allegations. Further replying, plaintiff alleges that in the said suit brought by the Iron Company (defendant here) on September 27, plaintiff (defendant there) filed a general demurrer to the petition. Presently, on May 15, 1907, the demurrer was sustained, and the Iron Company declining to plead further, judgment was rendered in favor of the defendant therein (plaintiff in this suit), that the Iron Company take nothing by its said suit, etc., which said judgment is herewith produced, pleaded as a general adjudication and bar of the defense set up by defendant's answer in this cause.

*Of the facts*:

To make his case plaintiff introduced the contract between himself and Deshler of date May 24, 1906. It will suffice to say of this contract that its terms and provisions sufficiently appear in plaintiff's bill and that the several answers of defendants admit the contract as there pleaded. Under that contract an abstract of title was furnished by plaintiff and examined by the attorneys for defendant Wright. On June 8, 1906, they gave an opinion to Wright in the form of a letter pointing out certain things they deemed defects in the title, which defects will be referred to further on. One clause of this opinion runs:

"10th. This title is very defective, and in our opinion a suit should be brought to quiet the title by the Statute of Limitations, unless the parties are prepared to furnish quit-claim deeds from all who hold outstanding titles."

Because of that opinion a supplementary contract (its force wholly spent on an extension of time in or-

der to bring the suit) was entered into between plaintiff and Deshler on the 30th day of June, 1906, viz.:

"It is hereby mutually agreed by and between the parties to the within and annexed contract that the time for the consummation of said contract is hereby extended to the 20th day of September, 1906, in order to enable the seller to bring a suit to quiet the title to the land described in said contract, as required in the opinion of Johnson & Lucas, attorneys for the buyer, dated the 8th day of June, 1906. In all other respects said contract is continued in force."

The case is put on both sides here on the theory all the alleged defects were satisfactorily explained or removed, except those the subject of the suit to quiet title, instituted by plaintiff on the heels of the supplementary contract; and in order to understand the occasion and scope of that suit a resume of the history of plaintiff's title is fit, viz.:

As to the west half of the land, there is an unbroken chain of title of record from the Government down, consisting of a patent at the outset, followed by mesne conveyances in unchallenged form, each entitled to record and duly recorded. As to the east half, there is a perfect record title from November 26, 1835, to this date, consisting of conveyances in due form, entitled to record and duly recorded. The title to the east half passed out of the Government in 1830 to Bowers and Lovelady, passed from them in 1831 to Linville, passed from him in 1832 to another Linville, passed from the latter in March, 1834, to John C. Young, and there stopped. In 1835 one Wilson, who had got title to the west half, ignoring the Young break, conveyed all the land to Robert Long, plaintiff's grandfather, and the two halves, reuniting in the grandfather, came to plaintiff through common deeds and by descent cast. All we know of Young is by a flash of light from a pioneer news item in the record to the effect that before plaintiff's grandfather acquired title

(i. e., in 1835), a John C. Young lived in a cabin on the place and (quoting from the testimony) "got into a fight and bit a fellow's ear and he has never been heard of since." Such is the history of Young, who took leg bail for it seventy-five years ago, and of his title. Among others made parties defendant to said suit to quiet title were the unknown heirs and devisees of this ear-marking Young, and their unknown husbands and wives.

Whether the idea was born of a mere lively imagination or had a more substantial root, we cannot make out, but an hypothesis seems to have been indulged by defendants and tolerated by plaintiff to the effect that possibly the name, "John C. *Young*," was a misnomer and that one John C. *Long* was intended as the grantee in said deed. There are no facts warranting such conclusion. The record does show, however, that plaintiff had an uncle, John C. Long, who died in 1840 in Kentucky. He seems to have owned land north of the land in question and when he died left three children, girls, and a will. At a certain time in 1887, when Kansas City and the region thereabout were sorely afflicted by that species of excitement and those diseased incidents in real estate dickering and scheming related thereto, known colloquially as a "boom," one Lee put a deed on record to himself from James R. Boyd, reciting that he, Boyd, was one of the children of Mary C. Boyd, who was a daughter of John C. Long, and another deed from Thomas P. Boyd, who described himself as a son of said Mary— a daughter of John C. Long. The larger body of land conveyed by these deeds was the *southeast* quarter of section 36, township 50, range 33; and does not concern us. However, there was inserted an indefinite description of other land, reading: "Also forty acres in the *southwest* quarter of the same section, township and range"—which might or might not involve the land in question. On the theory, as said,

that John C. Young was John C. Long, and that, therefore, the descendants of John C. Long might have an interest to be reckoned with, the said suit to quiet title was also brought against the said children of John C. Long and their known and unknown descendants, heirs and devisees and unknown husbands and wives and certain other parties not connected with the chain of title and concerning whose interests there is not a particle of evidence in the record.

Such steps were taken in that suit that the proceeding ripened into a judgment on constructive service against all the parties defendant as non-residents before September 20, 1906. The petition was submitted to the attorneys employed by defendant Wright. They knew the parties were non-residents and approved the proceeding as a proper one to subserve the end in view in their opinion of the 8th of June (and in the supplementary contract) to establish title of record by the Statute of Limitations and to quiet the same.

Going back a little and bringing down the other threads of the case to the date of September 20, 1906, it appears that the original contract spoke of Deshler in the male gender; that plaintiff and his agents supposed Deshler to be a man and the fact that she was a married woman was concealed from them. It seems the contract arose in this way: Plaintiff had a son, David, who was a real estate agent and had the land for sale. This David met up with one Dawes, another real estate agent, who joined with David in effecting a sale. Presently either Dawes or David or both came in contact with defendant Wright, another real estate agent, and interested him in the effort to get a purchaser. Wright pretended to find a purchaser in Deshler. She turned out to be the wife of a stockyard employee, an acquaintance of Wright in Kansas who had married the nephew of Wright's wife. She was without means, living upstairs in a tenement house, and

she either loaned her name to Wright's purposes or he assumed to use her name as a supposed purchaser. She paid nothing on the contract, did not want the land and was a mere "straw-man" as that term is used in the sharp maneuvering of real estate speculation. Wright furnished the $2000 advance payment and, though masquerading as an "agent," was the real purchaser, who had hopes of unloading on other parties he refused to name when his deposition was taken —all of which was unknown to plaintiff at the time. In the meantime Wright, assuming to represent Deshler, employed attorneys to examine the title and represent the purchaser, and brought plaintiff, his agents and attorneys in contact with such attorneys. On the 20th day of September, 1906, the date fixed by the supplemental agreement to consummate the transaction, plaintiff and his attorneys met Wright and his attorneys in the latter's office and there a transcript of the judgment in the suit to quiet title and a warranty deed were tendered in full performance of the contract by plaintiff, and, at some time during that interview, Wright demanded the advance payment back, which was refused by plaintiff. Performance was demanded by plaintiff and this was refused. It seems the attorneys representing the purchaser then and there shifted positions, saw by a new light a new obstacle to performance and announced the conclusion that their clients were not obliged to consummate the transaction for *three years* after the date of the decree quieting title. Such view of the law was first entertained and announced when plaintiff made his tender of a deed and decree and demanded performance. It is based on the notion that as the decree quieting title by limitations was on constructive service, a "bill of review" would lie under our statutes at any time within three years, *ergo,* the title did not become "perfected" until that time. They took the position they were entitled to tie up the land, holding their contract

right intact and alive for three years longer, until all danger of a bill of review had passed, and when that time came were entitled to consummation. Plaintiff repudiated this view of it and announced his determination of retaining the $2000 advanced, on the theory it was forfeited by the non-compliance of the purchasers with the terms of the contract of sale and on the theory that he, plaintiff, had fully performed by tendering a title such as called for by his contract.

After the meeting, things moved at a smart pace. As a result of a consultation with his attorneys, Wright later in the day paid Mrs. Deshler a silver dollar for a deed and had her make one to his corporate codefendant, containing the narration heretofore set out, which deed Wright recorded late in the afternoon. His said attorneys were some of the officers of the Iron Company and that company confessedly took with full notice of all the foregoing facts and circumstances, and with the understanding it would, if successful in recovering the advance payment, account to Wright in the premises. Presently, the Iron Company instituted its suit in equity—the life of its bill being to restrain plaintiff's conveyance of the real estate to anyone other than the Iron Company until such time as he "perfected" his title, alleging his failure to do so and its own ability and willingness to stand by the contract and perform. Cast on demurrer in that case (Lackawanna Coal & Iron Co. v. Long) the Iron Company appealed to this court—the judgment *nisi* being affirmed in an opinion just handed down and officially reported in 231 Mo. 605. Presently, after the Iron Company instituted its suit, plaintiff brought the instant suit.

In addition to the foregoing facts, it was shown at the trial by uncontradicted evidence that plaintiff, his grantors and their ancestors had been for 75 years in actual, visible, continuous and peaceful possession of the real estate as part and parcel of a cultivated farm (the *locus* being one of the oldest cultivated

fields in Jackson county) under a claim of the entire title as owners, and hostile to the whole world—a title never questioned before the opinion of defendants' attorneys, although portions of the land had been conveyed to railroads for rights of way and to a Jewish Cemetery association. So, for quite three-quarters of a century, plaintiff, his ancestors and grantors paid all taxes upon the land, and no other person for that time had paid any, nor had any possession of any portion thereof under any claim adverse to plaintiff's ownership.

The question is: On such a record, can the decree stand?

I. The petition alleging that plaintiff was "the owner in fee simple of" the land, and the answer admitting "that prior to May 24, 1906, plaintiff was the owner of the land described in the petition and on that day he entered into a contract to sell the same to one E. O. Deshler, as set forth in said petition," it is argued that plaintiff's title "in fee simple" stands admitted—in other words, he was relieved of the burden of proving title. But when the answer is read from end to end, we do not construe it that way. "In construing pleadings under the code, the doctrine of *contra proferentem* is not allowed in its one time common-law vigor and rigor. The old rule is much clipped by statute." [Sharp v. Railroad, 213 Mo. 1. c. 525.] The statutory rule of construction is that the allegations of a pleading, for the purpose of determining its effect, shall be liberally construed with a view to substantial justice between the parties. [R. S. 1909, sec. 1831.] Applying the doctrine of liberal construction, we are unwilling to rule that the admissions of the answer relieved plaintiff from proof of a good title. This view is fortified by the fact that plaintiff did not construe the answer below the way he does now. To the contrary, he voluntarily assumed the laboring

oar. That the *onus probandi* was on him was his theory below and he may ·not face the other way and spring a contrary theory on appeal. Such swaps are not favored. He made his own bed at the trial. Let him lie in it above as below.

We rule the point against him.

II. Plaintiff's counsel argue that because of the peculiar phraseology of the answers there was no issue raised on the record, for that each answer "denies each and every allegation in said petition contained, *except as are hereinafter specifically admitted.*" The point is that the exception corrodes the bowels of the denial. There are cases in which that form of denial is criticised. Doubtless, much of substance can be said against its use, and if we had entirely put it under the ban as a heresy, violative of those rules of good pleading that call for such certainty and precision as frame a sharp and plain triable issue, the profession of the law and the science of pleading ·might be the better off. But that form of denial, through long use and appellate toleration, is now venerable with age. Given that it is unattacked below, it has been allowed to raise an issue in too many cases for this court to now repudiate it *in toto* by making a case break on the point when the merits are here for review. The maxim is: The practice of the court is the law of the court. We do not mean to say after a denial with such a broad, evasive and vague exception tagged to it, a defendant might not make such following ·averments in his answer as sponged out his denial in whole or in part. In effect, that is what happened in Dezell v. Fidelity Co., 176 Mo. l. c. 279. So, by confession and avoidance defendant may entirely explode the office of his denial. That is what happened in State *ex inf*. v. Delmar Jockey Club, 200 Mo. l. c. 63, *et seq.* It will be observed the answer does not state what was denied or what was admitted. It puts the problem up to plain-

tiff to solve at his peril. In Long v. Long, 79 Mo. l. c. 649, it was held that a denial so framed as to leave doubt on what is admitted and what is denied put an unfair burden upon the court and the adverse party; that it was "vicious;" and that it "should be rectified by motion." But the court hung out the criticism as a danger signal. It proceeded to try out the case on its merits. In Snyder v. Free, 114 Mo. l. c. 367, *et seq.*, the half-denying and half-admitting style of pleading was fulminated against, but the case was not allowed to ride off on the point. It was decided on its merits. In Young v. Schofield, 132 Mo. 650, a pleading, unique in grammar and averment, was under consideration. It "denied each and every allegation and statement therein which is and *are* in any way inconsistent with the allegations in the petition" and "especially denies all new matter pleaded." That language is more evasive and baffling than the averments of the answer in the instant case. It was justly criticised as bad pleading, and yet the court went on to decide the case upon its merits. In Boles v. Bennington, 136 Mo. l. c. 528, *et seq.*, an answer was under consideration so uncommonly vague and inconclusive that it neither admitted nor denied the allegations of the petition relating to fraud. In that case it was held that fraud stood confessed by the answer.

In the case at bar no motion to correct the pleading was filed, neither did plaintiff move for a judgment on the pleadings, as in Snyder v. Free, supra, but both court and counsel proceeded on the theory they understood the answer in spite of the fact that it half denied and half admitted and threw upon them the burden of finding out which half was denied and which admitted. Under such circumstances, the point does not differ in its essence from that ruled in the first paragraph. The trial theory was that the answer was sufficiently specific and definite.

We hold plaintiff to his trial theory and rule the point against him.

III.   Recurring to the allegations of the answer and the reply relating to the pendency of a prior suit, entitled Lackawanna Coal & Iron Company v. Robert J. Long, having for its purpose an injunction against Long, restraining him from selling the property in question to anyone except the Iron Company when the title was perfected, in which suit the Iron Company was cast on demurrer to its bill and judgment went for Long, defendant Iron Company insists that the pendency of its prior suit abates the present suit. Counsel argue plaintiff was not entitled to maintain this suit when a suit was already pending, involving the same issues and in which all issues raised by plaintiff here could have been and will be determined there. In his reply, Long alleged that the judgment in the prior suit was *res adjudicata* and therefore a bar to the defense set up by defendant's answer in the instant case. But his counsel does not renew that contention in his brief.

Is there substance in the proposition advanced by defendant? The first case was never at issue on the facts. It passed off on a demurrer to the sufficiency of the petition. That the petition was bad was held both below and above. [See, Lackawanna Coal & Iron Company v. Long, 231 Mo. 605.] Even if we were inclined to hold that Long by way of defense to the first suit could have set up the same matter constituting the cause of action pleaded in his bill in the instant case, yet we could hardly hold that he was obliged to do that when the bill for injunctive relief against alienation stated no cause of action whatever. But if the bill had been good in the first case, the present plaintiff, defendant there, was not obliged to plead affirmative matter entitling him to affirmative relief and seek that relief by way of an answer in that suit. He had

the option to do that or not as he might elect.   More-over, the object and purpose of the two suits were not the same.   The principles of law applicable were not the same.   The parties are not the same.   "The ground upon which courts proceed in the abatement of subse-quent suits is that they are unnecessary, and there-fore deemed vexatious and oppressive."   [Rodney v. Gibbs, 184 Mo. l. c. 10.]   In the Rodney case the gen-eral rule, buttressed by abundant authority, was stated to be that:   "The defense of a prior suit pending ap-plies only when the plaintiff in both suits is the *same person* and both are commenced by *himself* and not to cases where there are cross-suits by a plaintiff in one suit who is a defendant in the other, because it can-not be said that either is prosecuting *two* actions against the other within the rule in question."   The rule is grounded on the abhorrence the law enter-tains for a multiplicity of actions and upon the maxim that no one ought to be twice vexed for one and the same cause.   In that case Mrs. Gibbs herself had sued and afterwards she was sued and pleaded by way of defense the matter set up in the first case as her cause of action.   In her second suit she asked affirmative relief and yet we held she was not precluded from do-ing so.   The Rodney case is a much stronger case than the one at bar .

The point is ruled against defendant.

IV.   There are related propositions in the case, viz.:   For plaintiff, that he had a title of the kind con-tracted for from two sources.   First, in fee simple by virtue of our several statutes of limitations—in other words, there were no defects and defendant should have accepted it under the original contract.   Second, at all events he did what defendant requested and fully performed under the supplementary contract.   There-fore, he was entitled to performance on the contract date (September 20, 1906)—this, on either ground.

*Contra,* for defendants, that the question whether
there were defects in the title prior to the decree quiet-
ing title is no longer open; that the supplementary con-
tract settles that question, because thereby plaintiff
admitted defects, and he may not take an inconsistent
position now. Further, that the decree quieting title
was not "effective" on September 20, 1906, because
rendered on constructive service by publication and
it did not become *absolute* for three years after its
date—this, by virtue of our several statutes providing
for vacating judgments, entered without summons, by
filing a petition for review within three years. [R.
S. 1909, secs. 2101 to 2108, inclusive.] To meet the
last point, plaintiff advances the proposition that the
suit to quiet title was under section 2538, Revised
Statutes 1909 (formerly Sec. 653, R. S. 1899); that
such section provides for service by publication, is
complete within itself, provides for a special case, viz.,
"a suit to perfect title by limitation," and specifies
the manner of process and service thereof, conclud-
ing with the provision that "when such service shall
be had, judgment and decree shall be rendered *the
same as though personal service had been had;*" that
Sec. 2538 is a valid exercise of legislative power; and
that the statutes relating to "petitions for review"
have no application to a suit to perfect title by limi-
tation under that section.

We pass to the consideration of such of the fore-
going propositions as we deem material to the case.

(a). Whether section 2538, supra, providing for
a suit to perfect title by limitation and the proceedings
therefor, is a complete code within itself, creating a
new right and providing a remedy not affected by the
general statutes relating to the filing within three
years of a petition for review of judgments rendered
without summons on an order of publication (R. S.
1909, secs. 2101 to 2108, inclusive, supra)—in other
words, whether the judgment became absolute at once,

under general statutes relating to the filing within three years of a petition for review under the latter sections, is a question *res integra* and close. Proceedings to quiet title by limitations under section 2538, supra, while not strictly *in rem* are in the nature of proceedings *in rem*. The judgment, operating on real estate within the State, has no extra-territorial force.

We have no difficulty in deciding that a State statute may provide that the title to real estate within its limits may be settled and determined by a suit in which the defendant, a non-resident, is brought into court by publication. [Arndt v. Griggs, 134 U. S. 316.] The trouble is: Is the judgment absolute, *eo instanti*, or subject for three years to review? For reasons presently considered the question is not determinative and we reserve it as open to be decided when a case arises hinging on the precise point.*

In this case, defendant is precluded from raising the point. It amounts, in effect, to an extension of time for performance to three years from the date of the judgment in direct violation of the contract time, September 20, 1906. There is nothing to show that the contracting parties had any such extension in mind when they made the supplementary contract. To the contrary, they had in mind the short extension named "in order," to quote from the contract itself, "to enable the seller to bring a suit to quiet title to the land" as required "in the opinion of Johnson & Lucas." To effectuate that purpose "the time for the consummation of said contract" was "extended to the 20th day of September, 1906," and in all other respects the original contract "was continued in force." That we

---

*Since writing the foregoing, we have at this delivery handed down a case (Burnham v. Clark, 232 Mo. 657), wherein our Brother GRAVES considers the point in connection with a kindred statute and rules against respondent's theory.

are right about the meaning of the contract is shown by the fact that the point never occurred to learned counsel for defendant until the very moment performance was demanded on the date agreed. It is clear that the meaning of the contract is that the decree to quiet title should become "effective," *for the purpose of consummating the sale,* at once on its rendition. Parties could make that kind of a contract if they chose and thereby waive the question whether the judgment would be "absolute" at once or in three years. To read into this real estate transaction an extension of three years for consummating it would give the buyer a most unconscionable advantage—an advantage he is not entitled to, unless by the clear words of the contract or by words necessarily implying the same thing. Plaintiff, in reliance upon the contract, brought suit to perfect title under the eye of defendants' counsel and the proceeding ripened into a judgment, on the theory that performance would be consummated on the rendition of that judgment. Having acted on this theory, defendants are estopped to deny such construction and spring a new one (after the event) giving the Iron Company a vast additional advantage, tying up the land for three years without interest and speculating on its rise *ad interim.* The time to have provided for such an extension was when the supplemental contract was written. True, estoppel is not pleaded, but where there is no opportunity to plead estoppel it is available as evidence. [Powell v. Tinsley, 137 Mo. App. l. c. 559, *et seq.*] But we need not rest the decision of the point on the technical ground of estoppel, it rests solidly on the terms of the contract and its proper construction.

We rule, then, that defendant Iron Company was not entitled to wait three years to test whether the judgment would remain unopened by a petition for review. We rule further that if plaintiff had a good

title by fee simple on that date, he was entitled to performance as of right.

(b). It is argued that by the supplemental contract plaintiff admitted defects; hence, it is inconsistent for him now to say there were none, but we see no inconsistency in A saying to B: "There are no defects in my title, but if there are, out of abundant caution, I have cured them at your request, under your supervision and in the very way you asked me to." But we need not pursue the matter; for under our ruling in paragraph "(a)" it does not touch the merits.

(c). The main question is: Did plaintiff, on September 20, 1906, have a title of the kind he contracted to give and was Deshler in default in performance at that time. If so, the Iron Company is also in default, for it took over the contract, *cum onere,* with full notice. Under this head, it is argued that plaintiff did not have a good title to one-half of the land by limitation. We shall let the point break on its merits, although we have no little doubt whether the Iron Company is in position to raise the point at all. This, because distinguished counsel now representing it suggested in their "opinion" that a decree perfecting title by limitations would do. Based on that suggestion, a contract calling for such decree was drawn and executed. Based on that contract, such a decree was obtained and tendered. May counsel now say that all this amounted to nothing? That the title is not perfect and performance not due? But waiving that view of it and attending to the merits they lie broadly with plaintiff on this record.

The elements of a title by limitation are uninterrupted possession—actual, visible, notorious, adverse and hostile, under color and claim of right for the statutory period. "The words adverse and hostile mean practically the same thing." [Weller v. Wagner, 181 Mo. 1. c. 161.] And either of them can be omitted in defining the character of the possession, provided the

other is used. The possession must be under a claim and color of right. "An entry by one man on the land of another is an ouster of the legal possession arising from the title, or not, according to the intention with which it is done; if made under claim and color of right, it is an ouster; otherwise it is a mere trespass; in legal language the intention guides the entry and fixes its character." [Probst v. Presbyterian Church, 129 U. S. 1. c. 191; Feller v. Lee, 225 Mo. 1. c. 326, *et seq.*] It must be adverse to the true owner in order to operate as an extinguishment of title in the true owner and to vest the right to the premises absolutely in the occupier. It must be uninterrupted. It must be notorious. There is no technical definition for the word "notorious." It means: Generally known and talked of; universally recognized; conspicuous; well, widely or commonly known. [Webster, *Tit.* "Notorious."] There can be no question but plaintiff and his ancestors and grantors had a possession of that sort for seventy-five years. The evidence so shows. That character of possession not only bars all adverse claims but creates and confers title in fee simple. It was a good title under the ten-year statute (R. S. 1909, sec. 1879), or under the twenty-four year statute (*Ibid.*, sec. 1881), or under the thirty-year statute (*Ibid.*, sec. 1834). And, under the terms of the contract held in judgment, defendant could not object to that character of title, whether it be considered from the viewpoint of being perfected by the decree or from the viewpoint of the *status* of the title before the decree. [Scannell v. American Soda Fountain Co., 161 Mo. 606; DeHatre v. Edmonds, 200 Mo. 246; Mitchner v. Holmes, 117 Mo. 1. c. 205, *et seq.*; Greffet v. Willman, 114 Mo. 1. c. 118, *et seq.*]

V. The parties, *sui juris,* by their contract at arms' length made their own law governing the advance payment. We sit to enforce fair contracts, fair-

ly made and not against public policy, not to abrogate them. By the contract terms, if the title be good and plaintiff kept his part of the contract and Deshler failed to comply with the requirements on "his" part within ninety days, as agreed, then the $2000 was to be forfeited to plaintiff. Deshler failed to comply with the contract, so did her assign, the Iron Company. The failure was intentional, based on a novel and wrong view of the contract and persisted in of set purpose to this moment. While equity does not favor forfeitures, yet equity will not aid a party to recover earnest money paid to a vendor not in default when such recovery is in the teeth of the agreement. Why should we do that?

The case was well pleaded, well tried and well decided. Let the judgment be affirmed. All concur, except *Valliant, J.,* who is absent.