In Re FIRST NATIONAL BANK OF ADRIAN, MISSOURI, Petitioner: DAVID DALTON, Interpleader, Respondent, v. B. W. CAUTHON, Interpleader, Appellant.

Kansas City Court of Appeals, May 2, 1921.

1. **APPELLATE PRACTICE:** Appellate Court Required to Weigh Evidence in Equity Cases and to Draw its Own Conclusions. In a suit in equity the Court of Appeals is required to weigh the evidence and come to its own conclusions in respect to the same.

2. **VENDOR AND VENDEE:** Evidence Held to Show Purchaser Accepted Title. In an action to determine the right to purchase money, evidence held to show that purchaser accepted the title to land, as shown by vendor's abstract, but before acceptance of deed purchaser changed his mind in reference to taking land.

3. ———: Evidence Held to Show Sufficient Abstract Furnished Purchaser. An abstract to 80 acres of land furnished purchaser, is *held* sufficient, though it was not all in one piece and incomplete as to form, but same deeds included in said abstract were included in the abstract to other parts of the land, and the contract did not require furnishing of separate abstract to each tract.

4. ———: **Purchaser not Entitled to Deduction for Alleged Shortage of Acreage.** Where purchaser claimed seller contracted to convey certain acreage in right of way of drainage district and the property sold was described in contract by sections, and as containing certain acreage, "more or less," the property was not sold at so much per acre, but for a certain aggregate amount, and the purchaser was not entitled to deduct value of land contained in said right of way, alleged to have been omitted from contract.

5. ———: **Repudiation of Contract by Purchaser Before Date of Performance Relieves Seller from Tendering Performance and Tender of Performance on Part of Purchaser was not Waived Thereby.** Where the evidence showed seller was fully able to perform his part of contract and had complied with all conditions of contract required of him before date of performance, and purchaser refused to comply with contract, until certain conditions not contained in contract, and which he had no right to make, were carried out by seller, the seller was not required to make formal tender of performances on date fixed therefor, and his failure to tender performance did not constitute a waiver of tender of performance on part of purchaser, as a condition precedent, preventing a recovery of the purchaser's earnest money.

6. ———: **Pleading: Seller's Pleading of Facts Sufficient to Constitute Plea of Waiver of Defective Title.** In a suit to determine right to purchase money, allegations of seller's pleading *held* sufficient to constitute a plea of waiver of defects in title.

7. ———: **Purchaser's Request for Deed Constituted Approval and Acceptance of Title.** The act of purchaser in requesting a deed constituted an approval and acceptance of the evidence of title since by the terms of contract, the deed was not to be executed until title was found to be good.

8. ———: **Purchaser Repudiating Contract Cannot Recover Earnest Money.** Where purchaser repudiated contract of purchase by making objections to title which were not consistent and showed a lack of good faith, he was not entitled to recover earnest money.

Appeal from the Circuit Court of Bates County.—*Hon. Charles A. Calvird,* Judge.

REVERSED AND REMANDED (*with directions.*)

*Silvers & Silvers* for respondent.

*D. C. Chastain* and *L. C. Crouch* for appellant.

BLAND, J.—The First National Bank of Adrian, Missouri, filed its bill of interpleader in the court below alleging that it held the sum of $1,000 which had been deposited with it under a contract had between David Dalton and B. W. Cauthon; that the contract had not been consummated; that both parties claimed the money; that the bank did not know to whom it belonged and asked that it be allowed to pay the same into court and that said persons be required to interplead for it. The money was then paid into court. Thereupon, B. W. Cauthon filed an interplea setting forth that on or about September 8, 1919, he and David Dalton entered into a written contract whereby he sold said Dalton a certain tract of land in Cass County, Missouri; that at the time of the signing of said contract said Dalton deposited with said bank said sum of $1,000 in part consideration of said sale; that under the terms of said contract said sum of money was due said interpleader. Said interpleader then alleged—

"This interpleader further states that said contract provided for the furnishing of an abstract of title, which this interpleader furnished to the said Dalton, and the same was accepted and the title approved by the said Dalton, but thereafter the said Dalton failed and refused to comply with his contract and consummate the purchase of said land, and so notified this interpleader."

It was further alleged by said interpleader that under the provisions of said contract said $1,000 should be forfeited in case the buyer failed to comply with the contract, and that said interpleader having complied with all the terms of said contract on his part was entitled to said sum of $1,000.

Interpleader Dalton filed his interplea alleging that he was at all times ready, willing and able to comply with the terms of said contract; that said Cauthon refused to comply with his part of the contract, having failed to furnish said interpleader within thirty days from the date of the contract a satisfactory abstract of title to the property, and failed to furnish said interpleader evi-

dence as to the non-existence of judgments, mechanic liens and taxes on the 1st day of March, 1920, when by the terms of said agreement the sale was to be consummated; that said Cauthon failed to convey to said interpleader the real estate by a sufficient warranty deed showing the property to be free and clear of all liens and encumbrances thereon on the 1st day of March, 1920. Said interpleader then alleged that he purchased the real estate at $125 per acre and on the basis that it amounted to 292 acres less a drainage right-of-way containing 6.34 acres; that said Cauthon fraudulently caused the draftsman of said contract to calculate the purchase price at $125 per acre for the whole 292 acres without deducting the value of the land contained in said right-of-way. We might say here that there was no evidence of fraud. There was a trial before the court which resulted in a judgment for interpleader Dalton and interpleader Cauthon has appealed.

The facts show that on the 8th day of September, 1919, Dalton and Cauthon entered into a written contract, which was drawn by one L. R. Allen, cashier of the First National Bank of Adrian, wherein Cauthon agreed to convey to Dalton certain land described by sections and as "containing in all 292 acres, more or less, except the right of way of ditches of the Grand River Drainage District at and for the price and sum of $36,500." $1,000 of the purchase price was to be deposited by Dalton with the First National Bank of Adrian, the balance to be paid on or before March 1, 1920, as follows: $10,000 in cash "and deferred payment by note, secured by trust deed on said land, which is to be a first lien on said land." Dalton agreed to pay the drainage assessments due after the 1st day of March, 1920. Cauthon agreed to furnish within thirty days a satisfactory abstract of title and such evidence as might be required by the buyer as to the non-existence of judgments, mechanic liens and taxes up to the 1st day of March, 1920. The contract further provided that if on examination it was found that the seller had a good

title, he was to execute a warranty deed to the land free
from all encumbrances except such as were assumed by
the buyer, and the buyer was to pay the balance of the
purchase money and execute a deed of trust "on or be-
fore March 1st, 1920." The contract further provided
that if the title was found to be defective and such de-
fects were note remedied by the date set for closing the
deal, then the contract should be null and void and the
sum of $1,000 deposited with the bank was to be re-
turned to the buyer; that "If, though, the title is good
and the seller has kept his part of the contract and said
buyer fail to comply with its requirements on his part
then the aforesaid deposit of $1,000 shall be forfeited;"
that the sale should be consummated by March 1, 1920.

In accordance with the contract Dalton deposited
$1,000 with the First National Bank of Adrian. Cau-
thon had his abstracts certified to September 18, 1919,
which certificate also included the statement that there
were no judgments, mechanic liens or taxes except a
deed of trust for $11,000. The abstracts were turned
over to Dalton and the latter turned them over to his
attorney, Judge Silvers, for examination. The exam-
ination was completed on September 23, 1919. Judge
Silvers raises several points of objection in reference
to the title. The abstracts and his opinion were then
turned over by Dalton to Cauthon who immediately
took them to his attorney, Judge Crouch. The latter on
October 4, 1919, wrote a letter attempting to answer the
objections raised by Judge Silvers, stating to Cauthon
that he had a good merchantable title and that the same
was shown by said abstracts. Cauthon returned the ab-
stracts and letter to Dalton who took them and deposited
them in a bank at Archie where they remained until
March 3, 1920, when Cauthon secured them.

We think there is no question but that the great
weight of the evidence shows that Dalton accepted the
title in October, 1919, without further procedure. Cau-
thon testified that when he received the abstracts and

Judge Silvers' opinion from Dalton the latter said, "The Judge says I have a good title to the land, all right, nobody could take it from you, if these minor objections were corrected, it would be all right;" that he brought the abstracts to the office of his attorney, Judge Crouch, and told him that he wanted to furnish a good abstract and that Judge Crouch examined the abstract and said that the objections of Judge Silvers were minor objections and wrote a letter setting forth his views, which Cauthon delivered to Dalton with the abstract. A few days afterwards Dalton came to Cauthon's place and said that the title "was in me (meaning ·Cauthon) and that he was ready to go down and have the deed put up." They arranged to have the deed delivered at the Adrian bank on October 22, 1919. Cauthon and his wife went to the bank on said day and signed and acknowledged the deed. Dalton had been to the bank but had gone to attend a sale. Cauthon saw him the next day at the bank. Dalton had talked to him over the phone and had asked him to come to the bank. When Cauthon arrived there·Dalton said that he wanted the deed and asked Cauthon to direct the bank to deliver it to him. Nothing was said about the title. Cauthon refused to allow Dalton to take the deed upon the payment of the $1,000, which Dalton wanted done. Cauthon asked Dalton if he accepted the abstracts and he answered "Yes, sir, I told you I did." Cauthon did not see the abstracts any more prior to the first day of March, 1920. Dalton moved on the farm in November, 1919, taking charge of part of it.

Cauthon further testified that during the last week of January, 1920, while Dalton was still upon the farm, the latter raised the first objection to the title made after the delivery of Judge Silvers' opinion. He then stated to Cauthon that there was·a judgment for $2300 against the property. Cauthon explained to him that there was no judgment against the property, that this amount represented drainage assessments and advised him to go to Harrisonville, the county seat, and look the matter up. Dalton told Cauthon in January or February that if the

latter did not pay the judgment he would not close the deal. Dalton also objected to the deed saying "292 acres, more or less." Cauthon further testified that he did not attempt to comply with any of the objections made by Judge Silvers because Dalton had accepted the title.

Cauthon further testified that Dalton notified him prior to the first day of March, 1920, that he was not going to take the farm; that on March 1, 1920, he went to the bank at Adrian about eleven o'clock in the morning, that he saw Dalton there but did not talk to him, about business; that he remained there until about 3:30 and that he told Mr. Allen, the cashier of the bank, that if Dalton wanted to settle according to the contract to call him (Cauthon) at Archie, a near-by town. The note and deed of trust for $11,000 against the property was at the bank at Archie. The evidence shows that Cauthon could have paid it off on that day; that he had the money wherewith to pay and that the holders would have permitted such payment. Cauthon and Dalton both testified that it was understood between them that the $10,000 to be paid by Dalton on March 1, 1920, might be used by Cauthon to discharge this indebtedness. (That sum and the $1,000 deposit would make up the $11,000 indebtedness against the land.) Cauthon told Allen that if Dalton desired to settle according to the contract to call him at Archie and he would bring the note for the $11,000. When Cauthon saw Dalton at Adrian he told him that Allen would represent him in settling the deal. He testified that he went to Adrian knowing that Dalton would not take the place under the terms of the contract. He admitted that he did not have at Adrian the abstract nor the note and deed of trust for the $11,000 on the place. Dalton had the abstract at the bank at Archie and did not produce it on March 1st. He testified that Dalton made no demand upon him on that day for further evidence as to the non-existence of mortgages, judgments, etc.

L. R. Allen, cashier of the First National Bank of Adrian, a witness for interpleader Dalton, testified that

he drew the deed on October 22, 1919; that Dalton saw the deed the next day when the witness read it over to him and Cauthon, and that no objection was made at that time; that Cauthon asked Dalton if he accepted the abstracts and Dalton replied, "Yes, I accept it, didn't I tell you so once;" that the next time he saw the parties was on the 1st day of March, 1920, when Dalton came into the bank at Adrian and at that time the witness called Cauthon over the phone and Cauthon came to the bank about 11:30 A. M. and remained there until about 3:30 in the afternoon. Dalton came into the bank about a quarter to four and asked where Cauthon was. The witness replied that Cauthon had gone but had authorized him to make a settlement on the terms of the contract. Dalton said that he would not settle according to the contract; that there was a judgment against the land for $2300 or $2400 that he wanted cleared up; that the judgment was against the land and grew out of the drainage ditches. The witness further testified that he was authorized by Cauthon to close the deal according to the terms of the contract and had an arrangement to call Cauthon at Archie and that Cauthon would bring the note and deed of trust from Archie if Dalton desired to close the deal; that he told Dalton he would call Cauthon and have him "come down to meet him" but that Dalton refused to close the deal wanting the alleged judgment "cleared up."

It was admitted that R. G. Wilson, who was assistant cashier of the bank at Adrian, if present would testify for interpleader Cauthon that he was present at the bank in October, 1919, when Cauthon asked Dalton, "Do you accept this abstract" and that Dalton replied, "Yes, I do, didn't I tell you so;" that at that time Dalton asked that the deed be turned over to him and the $1,000 given to Cauthon, that Dalton said to Allen, cashier of the bank, sometime in February, 1920, that he could not settle according to the contract, that there was a judgment against the land in the sum of $2300 arising out of the drainage district.

Interpleader Dalton testified that when the deed was placed in the bank in October, 1919, he went to the bank and Mr. Allen read over the deed to him; that he asked for the deed but Allen refused to give it to him and said that Cauthon wanted the $1,000 placed to his credit; that Cauthon was called up and came to the bank and told Dalton that he was not willing to give him the deed. Dalton told Cauthon that his construction of the contract was that he was to get the deed when he turned over the $1,000 and Dalton testified at that time "I certainly wanted it delivered to me." He testified that in January, 1920, he told Cauthon that he wanted the judgment for $2377 taken "off his farm," but that "I never told him I would not go ahead." (The amount of the assessment was $2383.625.) He testified in his deposition that he accepted the title to the land up to the time that he found out that "Cauthon breached his contract." He testified that he discovered that there were 80 acres of land for which there was no abstract and that Cauthon had sold him 6.34 acres of land that was included in the drainage district to which Cauthon had no title; that he told Cauthon in January, 1920, that he had broken his contract but that he had never told him that he would go ahead with the deal. He further testified that the real thing that caused him to refuse to proceed with the deal was that Cauthon had not furnished him an abstract covering the 80 acres where the house was situated and that Cauthon had sold him land that was in the drainage ditch to which he had no title. He testified that he knew the drainage taxes up to January 1, 1920, had been paid; that he knew the taxes for 1919 had been paid; that he knew when he signed the contract that the drainage ditches ran through the land; and that it had been explained to him that the improvement was to be paid for by annual taxes payable over a long period of years. He testified that he accepted the abstracts on October 23, 1919, at the bank of Adrian; that he moved on to the land on November 20, 1919, and moved away on March 4, 1920.

Dalton further testified that he saw Cauthon on March 1, 1920, and notified him to be at the bank on the morning of that day to take up the settlement; that Cauthon said "It was no use." Dalton then said that it was his duty and Cauthon replied, "May be he would be up after a while;" that he (Dalton) went to the bank and Allen told him "I had to come across according to the contract, letter for letter;" that Cauthon got in his car and never recognized him and that after Cauthon left "I seen I was out so I went home too." He testified that he was ready to fulfill the terms of his contract, that he had the money to make the $10,000 payment. His wife did not go with him to execute the mortgage because "he (Cauthon) did not have a clear title to the place." Dalton did not have the abstract with him.

It was shown that the abstract was extended and certified to May 2, 1920; that it then showed payment of all taxes for the year 1919 and that there was no judgment against Cauthon or a lien against the land other than the $11,000 deed of trust.

This is a suit in equity and as such we are required to weigh the evidence and come to our own conclusions in respect to the same. [Robards v. Clayton, 49 Mo. App. 608, 610.] We think that the great preponderance of the evidence discloses the following facts: That Dalton, after receiving the opinions written by Judge Silvers and Judge Crouch and after having been told by the former that Cauthon had a good title to the land and that nobody could take it from Dalton if he accepted it, and after reading Judge Crouch's letter in which the latter stated that Cauthon had a good merchantable title and assumed to answer the various objections made by Judge Silvers, saying that they were minor objections, was satisfied with the title and was willing to accept the deed in October, 1919; that between that time and January, 1929, something occurred to cause Dalton to change his mind in reference to taking the land. This may have been because he discovered the things that caused him to

make the latter objections, but these objections were so clearly without merit that we are not wholly convinced that such was the fact. It was shown that there was no foundation whatever for Dalton's objections, raised in January or February, 1920, and at the trial, to the title. There was no judgment against the land and the matter of the $2383.625 assessment for the drainage ditch improvement, which Dalton confused with a judgment, was fully explained. He testified that he fully understood the nature of this assessment; that he assumed them after March 1, 1920, and that it had nothing to do with his refusal to proceed with the deal.

In reference to the claim that no abstract was furnished for the 80 acres: There was an abstract to the 80 acres furnished but it was not all in one piece. One part of the abstract was incomplete as to form but the same deeds included in this abstract were included in the abstract to other parts of the land, and the contract did not require the furnishing of a separate abstract to each tract. Of course, Dalton knew of this alleged objection when he accepted the title in October, 1919. As to the claim that Cauthon had contracted to convey to him 6.34 acres of land in the right of way of the drainage district: The evidence shows that the property was described in the contract by sections and as containing 292 acres "more or less" and the right of way of the drainage district was specifically excepted. The property was not conveyed at so much per acre but for the price and sum of $36,500 so that the tract embraced in the contract was sold for the aggregate amount of $36,500 and not at the rate of $125 per acre. [Boxley v. Stevens, 31 Mo. 201.] However, the evidence shows that Dalton had a surveyor survey the land and it was found to contain more than 300 acres but Dalton did not put this surveyor on the stand. Dalton's objection in reference to this matter was clearly without foundation.

There were findings and declarations requested of the court by Cauthon. The chancellor found that Cauthon furnished an abstract showing good title to the land

and furnished sufficient evidence that there were no judg-
ments, liens or taxes against it except the mortgage for
$11,000; that Cauthon was ready and willing to discharge
said mortgage and could have discharged it on March 1,
1920; that Cauthon was able to give Dalton a deed con-
veying a good title on March 1, 1920, free from encum-
brances or liens except as to taxes thereafter to become
due; that Cauthon had complied with all conditions
that were required of him prior to that day. The chan-
cellor refused to declare that Cauthon was not required
to make a formal tender of performance to Dalton. He
refused to find that Dalton had not complied with his
part of the contract and that Cauthon did not do any-
thing for which he waived performance by Dalton. He
refused to find that Cauthon was ready on March 1, 1920,
to comply with his part of the contract. He refused
to find that the reason the contract was not carried out
on that day was that Dalton refused, except upon terms
not required of Cauthon, to perform his part of the con-
tract, and he also refused to declare in effect that if the
judgment that Dalton complained of was for drainage
assessments against the land that rendered it unnec-
essary for Cauthon to tender performance of the con-
tract on his part.

This is an equity case and the findings of facts by
the chancellor are not binding upon us but are advisory
only. They advise us as to the theory on which the court
tried the case. From the findings made and refused by
the chancellor it seems evident that he found that Cauthon
did not comply with his part of the contract by making
tender on March 1, 1920, and the chancellor must have
found that Cauthon waived performance on the part of
Dalton on that day, for assuredly Dalton did not tender
performance on his part. We think the learned chan-
cellor erred in his conclusions. There was no necessity
of a tender of performance on the part of Cauthon on
March 1, 1920, assuming that the facts show that he did
not tender performance on that day. The evidence shows

that Cauthon was fully able to perform his part of the contract on March 1 1920. According to the testimony of Cauthon, Dalton had repudiated the contract prior to that day. He had notified Cauthon that he refused to proceed with the performance of the contract. This testimony of Cauthon is corroborated by the testimony of Dalton himself, for the latter claimed that in the contract Cauthon agreed to convey land to which he had no title and refused to proceed with the deal. We construe Dalton's testimony to mean that he was willing to go through with the contract when Cauthon procured title to the 6.34 acres of land, furnished an abstract to the 80 acres and paid off the supposed judgment. From what we have said Dalton by this conduct was refusing to perform unless requests which he had no right to make were complied with. Under the facts a tender on the part of Cauthon was not necessary. [38 Cyc. 134, 135, 136; Deichmann v. Deichmann, 49 Mo. 107; Whelan v. Reilly, 61 Mo. 565, 568; Westlake & Button v. City of St. Louis, 77 Mo. 47, 51; Black River Lumber Co. v. Warner, 93 Mo. 374, 388; Massey v. Butts, 221 S. W. 153; Sturdivant Bank v. Houck, 215 S. W. 758.] Cauthon, at no time prior to notification to him by Dalton that the latter repudiated the contract, if at all, indicated that he would not comply with his part of the contract. There was, therefore, no waiver on the part of Cauthon of tender of performance on the part of Dalton.

Interpleader Dalton insists that Cauthon bound himself by the contract to furnish a satisfactory abstract of title within thirty days from the date of the contract and to furnish evidence as might be required of the buyer as to the non-existence of judgments, mechanic liens and taxes against the property up to the first day of March, 1920, and that the record title appearing to be defective as set out by Judge Silvers' opinion, it was Cauthon's duty to clear up the defects by March 1, 1920. The evidence shows that the matter of Judge Silvers'

objections to the title was not insisted upon by Dalton. Interpleader Cauthon insists that Dalton had a right to accept any title that he might desire, and that Dalton's conduct was an acceptance of the title and not a waiver of the defects in it. However, we gather from interpleader Dalton's brief that he claims that if he accepted the title in October, 1919, the same constituted a waiver of the defects in it and that no waiver was set up in Cauthon's interplea. While the interplea of Cauthon does not in so many words plead waiver, the facts alleged therein, which we have quoted supra, amount to a waiver and that allegation was sufficient to constitute a plea of it. [Cadematori v. Gauger, 160 Mo. 352, 367.]

The act of Dalton in October, 1918, in requesting a deed constituted an approval and acceptance of the evidence of title since by the terms of the contract the deed was not to be executed until the title was found to be good. However, there is no question from the evidence but that Dalton accepted title to the property at that time and never thereafter raised any objection to it except as to the matter of the alleged judgment, the abstract to the 80 acres, and the 6.34 acres of land in the drainage ditch the title to which he claimed he had the right to require conveyed to him. As we have already said there was no merit in these later objections and by his conduct in October Dalton led Cauthon to believe that the other requirements of Judge Silvers were not to be insisted upon. Cauthon was therefore at all times ready and able to fulfill his part of the contract but tender of compliance on his part was waived on the part of Dalton when the latter notified Cauthon prior to March 1st that he refused to proceed with his part of the agreement.

As to the contention that Cauthon did not furnish an abstract showing evidence of the non-existence of judgments, mechanic liens and taxes against the property on March 1, 1920, the contract provided only that "such evidence as may be required by the buyer" should be

furnished of such matters. No such evidence was, requested. Dalton testified that he knew the drainage taxes and the state and county taxes that were due up to January 1, 1920, had been paid and that he knew about the drainage district and that the improvements were to be paid for by annual taxes payable over a long period of years. He assumed the drainage taxes due after March 1, 1920. It is true that he testified that there was a judgment against the property but it was fully explained to him that there was no such judgment. There was no likelihood that there was any. He testified in his deposition to the effect that he did not refuse to proceed with the deal on account of the alleged judgment, but the sole cause of such refusal was that Cauthon had failed to furnish an abstract to the 80 acres and had sold land in the drainage ditch to which Cauthon had no title. Dalton's claims were not at all times consistent and to our mind show a lack of good faith on his part. He did not request a certificate or evidence to show that there was no such judgment but asserted as a positive fact that there was. We think that interpleader Cauthon was clearly entitled to recover. [Buchman v. Ennis, 199 Mo. App. 674; Long v. Lackawanna Coal & Iron Co., 233 Mo. 713; Wainscott v. Haley, 185 Mo. App. 45.]

The judgment is reversed and the cause remanded with directions to enter judgment in favor of interpleader Cauthon. All concur.